Commonwealth v. Tate, &c.

CASE 90—PETITION ORDINARY—FEBRUARY 27.

## Commonwealth v. Tate, &c.

APPEAL FROM FRANKLIN CIRCUIT COURT.

1. THE NEGLIGENCE OF ONE STATE OFFICER WILL NOT RELEASE THE SURETIES OF ANOTHER. Therefore, a failure upon the part of the Auditor and Secretary of State to perform the duties imposed upon them by statute, with reference to the periodical examination of the Treasurer's accounts, will not release the sureties of the Treasurer from liability for the defalcation of their principal.

2. EVIDENCE.—A bank pass-book regularly and accurately kept by the State Treasurer, in connection with the discharge of his duties, was competent to go to the jury as a part of his official transactions in an action upon his bond.

3. SAME.—In an action upon the bond of a defaulting Treasurer the jury should not be required to investigate, item by item, the books showing the official transactions of the officer, but persons competent to understand the books, having investigated them, should be allowed to explain them to the jury and to state the result of their investigation.

<table>
<tr><td>89</td><td>587</td></tr>
<tr><td>89</td><td>611</td></tr>
<tr><td>89</td><td>587</td></tr>
<tr><td>104</td><td>583</td></tr>
</table>

4. Peremptory Instruction.—If the plaintiff's evidence tends to make-out his side of the issue, in whole or in part, it is the duty of the court to let the case go to the jury, although the court may be of opinion that if there should be a verdict for plaintiff, it should be set aside.

5. Same—Partial Transcript.—It is not necessary that the record, upon appeal, should contain all the evidence heard on the trial, in order to enable the appellate court to decide that the trial court erred in giving a peremptory instruction for defendant. If there is evidence in the record tending to show the plaintiff's right to recover, the court will reverse, although it may appear that a part of the evidence heard is not before the court.

P. W. HARDIN, Attorney-General, for appellant.

Brief not in record.

THOMAS H. HINES on same side.

1. The court should not grant a peremptory instruction, although the presiding judge should be of the opinion that if the jury should find adversely to the request for such instruction, he would be compelled to sustain a motion for a new trial. (Buford v. L. & N. R. R. Co., 82 Ky.; 287; Thompson v. Thompson, 17 B. M., 22.)

2. Not only was there evidence tending to show that public funds were misappropriated by the Treasurer during the time for which defendants were his sureties, but it is made conclusively to appear, by the highest grade of evidence, that the public moneys were converted to the extent alleged.

3. The negligence charged against the Auditor and the Secretary of State is not sufficient to release the sureties of the Treasurer. The requirements of the statute, as to the statement of the accounts of the Treasurer, are for the security of the State, are directory only to the officers required to make the statement, and constitute no part of the contract with the sureties on the bond of the Treasurer. (Gen. Stats., chap. 108, art. 1, sec. 4; United States v. Kirkpatrick, 9 Wheaton, 735-6; Postmaster-General v. Reeder, 4 Wash., 684; United States v. Vanzant, 11 Wheaton, 189; Jones v. United States, 18 Wallace, 622; Ryan v. United States, 19 Wallace, 517-18; Osborne v. United States, 19 Wallace, 578; Hart v. United States, 95 U. S., 316; Board of Supervisors v. Otis, 62 N. Y., 89; Banta v. Mercer County Court, 7 Bush, 577; Keel v. Preston, 5 Mon., 584; Brandt on Suretyship, sec. 474; People's Building Asso. v. Wroth, 43 N. J. L., 70; Supervisors v. Birdsall, 4 Wend., 453; Supervisors v. Jones, 19 Wis., 51; Farmington v. Stanley, 60 Me., 474; State v. Tax Collector, 40 La. Ann., 236.)

4. It is not necessary that all the evidence given to the jury should be

Commonwealth v. Tate, &c.

exhibited in the bill of exceptions, in order to enable this court to say that the trial court erred in giving a peremptory instruction to find for defendant. It is necessary only for appellant to present, in the bill of exceptions, enough evidence to show a *prima facie* right to recover. (Easley v. Easley, 18 B. M., 93.)

5. The records of the Auditor's office and of the Treasurer's office were competent evidence against the sureties. (Gen. Stats., chap. 108, art. 2, sec. 1; *Idem*, chap. 6, art. 1; State v. Tax Collector, 40 La. Ann., 437.)

The report of the Treasurer, made to the Legislature June 30, 1883, was competent evidence against the sureties as to the amount of money in the Treasurer's hands at the beginning of his term. (Gen. Stats., chap. 108, art. 2, sec. 2; Bruce v. United States, 17 Howard, 439; Cassidy v. Trustees, 105 Ill., 560; United States v. Gaussen, 19 Wall., 198; Rhodes v. Commonwealth, 6 B. M., 359, 362; Van Sickle v. The County of Buffalo, 13 Neb., 103.)

A. DUVALL, W. LINDSAY, D. W. LINDSEY, F. CHINN, J. W. RODMAN, P. B. THOMPSON, Sr., W. A. SUDDUTH for appellees.

1. The bill of exceptions must contain all the evidence, otherwise the court can not review the judgment below upon the testimony, even for the purpose of determining whether or not the court erred in giving a peremptory instruction. (L. & N. R. Co. v. Finley, 86 Ky., 297; Brockle v. Brockle, 7 Ky. Law Rep., 760; Haggard v. L., C. & L. R. Co., 7 Ky. Law Rep., 660.)

Deeds, wills, books, and other writings introduced as evidence should be copied into the bill of exceptions. (Vaughn v. Mills, 18 B. M., 633; Haney v. Tempest, 3 Met., 95; Duncan v. Brown, 15 Mon., 186.)

The bill of exceptions in this case does not contain any of the books, papers and documents in evidence below, and, therefore, this court can not review the judgment for the purpose of determining whether the court erred in giving a peremptory instruction.

2. Where, as in this case, an officer is his own successor, the sureties are only liable for defaults of their principal committed during the term of office for which they became his sureties, and are not responsible for any misappropriations occurring either before the commencement or after the end of the term covered by their bond. (Murfree on Official Bonds, sec. 639; Vivian v. Otis, &c., 24 Wis., 518; s. c., 1 Am. Rep., 199; Meyers v. United States, 1 McLean, 493; Bissell v. Saxton, 66 N. Y., 55; Farrer v. United States, 5 Peters, 389; United States v. Boyd, 5 How., 50; Treasurer of Vermont v. Mann, 80 Am. Dec., 88.)

3. The books and papers introduced as evidence on the trial below were

*not only* the best evidence, but the only legal evidence (as they were to be had and were present) of what they contained, and of the facts their contents would establish. (Wharton on the Law of Evidence, vol. 1, sec. 60; Poore, &c., v. Robinson, 13 Bush, 293.)

As a general principle, a written copy of a written instrument will not be received when the original can be had. (Wharton on Evidence, vol. 1, sec. 73.)

4. It was necessary for appellant to establish the amount of money Tate, as Treasurer, actually had on hand at the beginning of the term, on the first Monday in January, 1882, as a basis to commence with, in order to show any defalcation for which appellees would be responsible. (Myers v. United States, 1 McLean, 296.)

5. As it is the duty of an officer to have on hand balances charged to him in his official accounts, he is presumed to have such funds in his hands. (Murfree on Official Bonds, sec. 219; Bruce v. United States, 17 How., 437; American Leading Cases, Hare & Wallace, 5th ed., vol. 2, p. 480.)

But this presumption will not avail to establish the money Tate had on hand when appellees became his sureties, because both parties allege the presumption is not true.

6. The "pass-books" were but copies from the bank-books, and, in the presence of the original books, it was proper to reject the copies, especially when, in some respects, the latter were shown to have been deficient, and not altogether reliable.

A party must produce the *best evidence* of which the case is, in its nature, susceptible. (Greenleaf on Evidence, vol. 1, sec. 82; Starkie on Evidence, vol. 1, pages 103 and 390; Philips on Evidence, pages 418 and 424; Wharton on Evidence, vol. 1, sec. 73; Davidson v. Davidson, 10 B. M., 115.)

7. The court properly refused to allow Mr. Weaver, as an expert in book-keeping, to answer certain questions propounded to him, as the result of allowing the witness to answer the questions would have been to permit him to try the case and announce to the court and jury the result of the trial. Expert testimony is not admissible upon a question which the court or jury can decide upon the facts. (Stutmore v. Shaw, 6 Stat. Rep., 412; Lawson on Expert and Opinion Evidence, 203; Rogers on Expert Testimony, 11; 66 Am. Dec., p. 230, note; Ferguson v. Hubbell, 97 N. Y., 507.)

The mere conclusions of witnesses as to the substance and effect of entries are not competent. The entry itself, or an exact copy thereof, must be presented to the court. (Poor, &c., v. Robinson, &c., 13 Bush, 294.)

8. The law relating to a contract, in force when the contract is made, enters into and becomes a part of it; and even conceding that statutes

merely directory to officers form an exception to this rule, section 4 of article 1, chapter 108, General Statutes, is not directory merely.

For a definition of a directory provision of a statute, see Rapaje & Lawrence's Law Dictionary.

9. But whether the provisions of the section of the statute referred to are mandatory or merely directory, the agency of the State, charged with the duty thereunder, undertook to perform it, and certified that they had performed it according to law, and that Tate had the money with which he was properly chargeable at the commencement of his succeeding term; and in either event, this action of the State's agents having lulled the sureties into the belief that their principal had performed the conditions of his bond, and thus deprived them of the power of procuring indemnity, operates to release them. (Hobson & Sureties v. Commonwealth, 1 Duv., 172; *ex parte* Robert B. Randolph, 2 Brock., 447; Banta v. Mercer County Court, 7 Bush, 576; Story on Agency, 9th ed., sec. 307*a*; Baker v. Briggs, 19 Am. Dec., 311; Hunt v. Brigham, 2 Pick., 583; 13 A. D., 458; Sneed's Ex'r v. White, 3 J. J. M., 525; Am. Leading Cases, 5th ed., vol. 2, p. 461.)

In each of the cases relied upon by counsel for appellant the laches, which the court held as insufficient to discharge the sureties, was the *failure* of the obligee in the bond, through its officer, to comply with some statute, provision or rule, merely directory; in each instance, the government's officer *failed* to act in the premises. In no one of those cases did the sureties rely upon an acquittance, executed to the officer at the end of his term by public agents, acting strictly within the scope of their authority, and charged with the duty of *themselves* stating and adjusting the accounts of the retiring officer, and making a public record of such statement and adjustment.

10. The appellees were induced to enter into the contract of suretyship by reason of the representation of the State, through its agents, that Tate's accounts and books had been examined according to law, and that the proper amount of public money was found in the Treasury. This representation being untrue, the contract must be adjudged invalid. (Ford, &c., v. McComb, 12 Bush, 726; Graves, &c., v. Lebanon Nat. Bank, 10 Bush, 23.)

11. The several statings of the accounts of Tate, Treasurer, by the Auditor and Secretary of State, were the acts of the State. (Fletcher v. Peck, 6 Cranch, 87; Story on Agency, 9th ed., sec. 307*a*.)

12. The motion to transfer to equity was properly overruled. There was no error made as to the form of action. (Civil Code, sec. 6.)

But if there was an error as to the form of the action, it was waived by failure to move for its correction at the time and in the manner prescribed by the Code. (Civil Code, secs. 8, 9, 15.)

JUDGE BENNETT DELIVERED THE OPINION OF THE COURT.

James W. Tate, on the first Monday in August, 1867, was elected Treasurer of the appellant for the term of two years, beginning on the first Monday in January, 1868. He was elected biennially thereafter until the first-Monday in August, 1887, at which time he was again elected for the term of two years, and held the office until the 20th of March, 1888, at which time the Governor and Secretary of State suspended him from the duties of his office, and in a few days thereafter the Legislature impeached him, and he was removed from office.

The appellant seeks by this action to recover of the appellees, the sureties of said Tate on his official bond for the term of 1882 and 1883, the sum of sixty-three thousand nine hundred and forty-eight dollars and ninety-one cents, the alleged official defalcation of said Tate during said term.

The appellees, as the sureties aforesaid, denied that Tate committed any act of defalcation during said term; alleged that he had committed defalcations for large amounts during his preceding terms, which, by means of false entries, were carried into the term of 1882 and 1883 as so much cash on hand; but, in fact, the sum apparently carried forward into said term as so much cash on hand was not cash, but represented said Tate's previous defalcations, and the appellees were not bound on said bond for the same. They also plead that Tate, as Treasurer, could receive no public money, and did receive none, except by the written permit of the Auditor, and could pay out no public money, and did not pay out any, except upon

the warrant of the Auditor; and as the Auditor was
required to settle with him once a month, and the
Auditor and Secretary of State were required to make
biennial settlements of his accounts, &c., it was im-
possible for him to make any defalcation and not be
detected in the fact by the Auditor, or the Auditor
and Secretary of State, unless these officers were dere-
lict in their duty; that said duties of these officers
entered into the contract with the appellees as the
sureties of said Tate, and became a part of it; and
as the Auditor had monthly settlements with Tate
during the years 1882 and 1883, and the Auditor and
Secretary of State made a biennial settlement of his
accounts, &c., for those years on the 7th day of Jan-
uary, 1884, and reported his accounts with the appel-
lant as all right; and the appellees, in good faith,
relying on the same as correct, and, therefore, taking
no steps to indemnify themselves against the alleged
defalcation; and if there was such defalcation, the
same could not have happened or remained undiscov-
ered, except by the negligence of the Auditor and
Secretary of State; and as a faithful discharge of
their duties in this regard formed a part of the con-
tract with the appellees, and as their neglect to per-
form them would cause a loss to fall on the appellees
which would not have fallen upon them had these
officials diligently and efficiently discharged these
duties, they, the appellees, are released.    They also
allege that said Auditor and Secretary had, pre-
viously to 1882 and 1883, reported monthly and bi-
ennially that said Tate had kept faith with the State,
and his official dealing with it as Treasurer was cor-

rect; and as it was upon the faith of the truth of these statements that they signed said Tate's bond as sureties, and as it was upon the faith of these monthly and biennial statements relative to the term of 1882 and 1883 that caused the appellees to rest under the belief that Tate was not in default, and to take no steps for their indemnity, the appellant is estopped to proceed against them.

The bond, executed by Tate and the appellees for the term of 1882 and 1883, is as follows:

"Whereas, James W. Tate, of the county of Franklin, was, at the general election, held the first Monday in August, A. D., one thousand eight hundred and eighty-one, duly elected Treasurer of the State of Kentucky. Now we, James W. Tate, principal, and the other subscribers hereto as his sureties in this official bond of said Tate, do hereby bind ourselves jointly and severally to the Commonwealth of Kentucky that the said James W. Tate, as Treasurer aforesaid, shall faithfully and diligently discharge all the duties appertaining to said office. In witness whereof, the said James W. Tate and the other subscribers hereto, as his sureties, have set their respective hands," &c.

The Treasurer's duties are, among others, "to receive and safely keep in the Treasury all money due or payable to the Commonwealth from collectors of revenue, public officers and others, when tendered, accompanied by the permit of the Auditor of Public Accounts, stating the amount to be received, on what account, and from whom to be received. He shall immediately make out a receipt for the amount received, and for

what, and of whom received, and deliver it to the Auditor, who shall, in like manner, give a receipt to the officer or person paying the same. The receipt, besides stating the amount paid, shall also, if it be all that is due from the officer or person, so state." (Section 9, chapter 108, General Statutes.)

"The Treasurer shall not receive into nor pay out any money from the Treasury, except upon the certificate or warrant of the Auditor." (Section 7, chapter 108, General Statutes.)

"If the Treasurer willfully misapply any of the public money, or shall loan or use the same for his own purposes or for the uses or purposes of another, he shall be guilty of felony," &c. (Section 10, chapter 108, General Statutes.)

According to these statutes, it was the duty of the Treasurer to receive and safely keep in the Treasury all public money tendered, upon the permit of the Auditor, and to pay the same out only upon the warrants of the Auditor, specifying the amount to be paid, to whom, and for what. It was his duty to safely keep said money, unless paid out as aforesaid; and to appropriate the same to his own use, or that of another, &c., was a plain violation of his official duty—a breach of official trust, for which his sureties, by the express terms of the bond, were liable. There are no conditions or provisos in or attached to this bond whatever. The bond is a plain, unqualified and unconditional undertaking on the part of the appellees, as the sureties of Tate, to be responsible for the faithful and diligent discharge of all the duties appertaining to the office of Treasurer, and to

answer in damages for any failure of his to discharge any of said duties; and, as we have seen, one of said duties was, not to use or appropriate, for his own benefit, or that of another, any cf the public money intrusted to his safe-keeping, except to pay the same out upon the warrant of the Auditor. But did the failure of the Auditor to do his duty, whereby the Treasurer was able to appropriate the State's money to his own use, and conceal the fact, and receive from the Auditor monthly and from the Auditor and Secretary of State biennial statements that his official duties, in regard to the State's money, were honestly and correctly discharged, release the sureties from their obligation to pay to the State the amount of Tate's defalcation? In other words, did the Auditor's and Secretary's duty impliedly form a part of the contract with said sureties, or estop the State, so far as the sureties were concerned, from contradicting said settlements?

It is contended that Tate could not have stolen from the Treasury, and have escaped the detection of the Auditor and the Secretary of State, had the first-named made proper and efficient monthly settlements, and the two together biennial settlements with him. Rather, he could not have stolen from the Treasury, except after the last monthly settlement and before the next, without the theft, at said next settlement, being detected, if the Auditor had performed his official duty in that regard; and the theft, however often committed, would be discovered, beyond a peradventure, at the next biennial settlement, if the Auditor and Secretary of State had performed their official duty.

The Treasurer could receive no money due the State, except by the permit of the Auditor, stating the amount to be received, on what account, and from whom received. It is the Treasurer's duty to immediately receipt the Auditor for the same, stating the amount received, for what, and from whom received; and the Auditor, in like manner, receipts to the officer or person paying the same. Each transaction of this sort is entered in detail in the official books of each officer, and the permits and receipts are preserved by each.

The Treasurer can pay no money out of the Treasury, except upon the warrant of the Auditor, specifying the amount, to whom, and for what, which amount, to whom, and for what, he must enter in his books. His books must show, in full and in detail, the respective amounts paid into the Treasury, when, by whom, and for what. They must also show to whom warrants have been issued, when, and for what amount, and that the same has been receipted for by the Treasurer. Also, the Treasurer must report once per week to the Auditor all payments at the Treasury, and the warrants upon which the same were made. (Section 3, article 2, chapter 108, General Statutes.) Also, the "Auditor and Treasurer shall, once in each month, make a settlement of the receipts and disbursements of the money at the Treasury of every description, under appropriate heads, and file the same with the Secretary of State, whose duty it shall be to report them to the General Assembly within the first ten days of each regular session; and the Auditor shall, once in each month, ascertain

whether the money on hand in the Treasury agrees with the books of the Treasurer. The result of such investigation he shall immediately report to the Governor." (Section 4, article 2, chapter 6, General Statutes.)

"Upon the expiration of his term or resignation of his office, or death, the Secretary of State and Auditor shall examine his accounts, state the same, count the money in the Treasury, take an inventory of the property, &c., of his office, and take a receipt for same from his successor in office." (Section 4, article 1, chapter 108, General Statutes.)

It will be seen that it was the duty of the Auditor to give permits for the receipt of all public money by the Treasurer, and he could lawfully receive no public money without said permit; and if he had received it without such permit, the Auditor, whose duty it was to look after the payment of such money, would, if he did his duty, soon discover the fact; and it was the duty of the Auditor to issue all warrants for the payment of the public money, and the Treasurer could make no payment of the same without such warrants. Said warrants should state the amount to be paid, to whom paid, and on what account, and the Auditor should make corresponding entries of these matters on his books. It was also the duty of the Treasurer to make weekly reports to the Auditor of all payments at the Treasury, and the warrants upon which the same were made, &c. From these reports the Auditor could and should see whether or not the payments were made in accordance with his warrants, an accurate account of which was in his office, and from

which he could tell how much money ought to be on hand. Also, it was the duty of the Auditor to make monthly settlements with the Treasurer of the receipts and disbursements of the money in the Treasury of every description, &c. The Auditor could and should ascertain from his own books how much money the Treasurer had received during the month, and how much he had been authorized to pay out; and it was his duty to ascertain whether the money on hand in the Treasury agreed with the books of the Treasurer, &c. As before said, he could tell whether the books of the Treasurer truly showed the amount of money that had been received and the amount authorized to be paid out, and by making a deduction of any outstanding checks that had been issued by the Treasurer on his warrants, he could tell whether the money on hand agreed with the Treasurer's books. Merely settling by comparing the balance sheets of the Auditor's and Treasurer's books, and thereby ascertaining the respective amounts of the receipts and expenditures, was not a compliance with the statute *supra*. Under such practices the Treasurer could steal for two years, which the statute *supra* was designed to prevent. Also, in the biennial settlement of the Treasurer's accounts, as required by section 4, article 1, chapter 108, General Statutes, the Auditor's books, if correctly and truly kept, would show the amount of money, and by whom paid, that went into the Treasury during said term, and the amount of disbursements, and to whom, during said term. Also, he could, without involving an unreasonable task, count the money in the Treasury, and ascertain whether the same was correct, or,

if the same was in the banks used as depositories, personally apply to them for the correct amounts.

If some of the public debtors had paid by checks drawn on some one of the banks of the State, and the same had not been collected, the Auditor's books would show that permits had been granted for these amounts, and the exhibition of the checks themselves would show that they had not been collected; or, if they had been forwarded by any one of the three banks used by the Treasurer as State depositories, and had or had not been collected, the same could be ascertained at such bank; or, if the Treasurer had exhibited a list of checks drawn in favor of any creditors of the State on any one of said banks, the Auditor, by simply comparing them with the corresponding warrants and receipts, could tell whether they were authorized, and the actual amount of money in the Treasury or banks would show how many of these checks had been paid to the creditors, and how much money had been received on the checks given to them by the State's debtors. The law requires these duties of said officers in making their monthly and biennial settlements of the Treasurer's accounts, &c., in order to additionally secure the safety of the public money, and to speedily and certainly detect and expose any theft of it by the Treasurer.

On the 7th of January, 1884, the biennial settlement of the Treasurer's accounts was made as of the 31st of December next preceding. Between the 31st of December and the 7th of January the Treasurer, upon the permits of the Auditor, had received about seventy-five thousand dollars. It seems that the Treas-

urer took a sufficiency of this sum to make his books
correspond with the Auditor's down to the 31st of
December, and then entered the amounts making up
the seventy-five thousand dollars as of the proper dates
in the month of January; thereby the books down to
December the 31st were made to balance, and the Jan-
uary statement was made to appear all right. Why did
not the Auditor and Secretary detect this fraud? The
Auditor says it was because he did not consult ·his
books in reference to said matter on the occasion of
said settlement; that said settlement was made by the
Treasurer's books alone. This, the Auditor says, was
"not excusable, of course." He also states that the
Treasurer's accounts at the banks were not personally
examined, but that the Treasurer's entries, and evi-
dences of the same, were relied on in ascertaining the
amount of the public money therein.

We have been thus particular to state the Auditor's
and Secretary's duties, and their alleged omissions of
duties, without meaning to cast any personal reflec-
tions on either of them; but the statements are made
in view of the fact that the appellees rely upon these
supposed omissions as a breach of contract on the
part of the State, or as an estoppel whereby the ap-
pellees are released from liability on said bond, which
propositions we will proceed to discuss.

The appellees went the sureties of Tate that he would
faithfully and diligently discharge all the duties of his
office. There were no conditions or provisos attached
to this undertaking. If he could not have stolen ex-
cept by the Auditor's connivance—a fact not decided
to exist—or negligence, and he was thus enabled

to steal, it was, nevertheless, a breach of faith on his part, for which his sureties are liable. The law-makers attempted to hedge him in with safeguards, so that he could not steal without the theft being almost immediately discovered, and him deprived of his office, if the officer or officers whose duty it was to look after him did their duty; nevertheless, he was required to give bond, with sureties, in a large sum that he would faithfully discharge his duties. Also, the Auditor was not the trusted supervisor of the Treasurer; for he too was required to give bond for the faithful discharge of his duties. The fact that this officer might be negligent did not license Tate to steal. It, nevertheless, was his duty to be faithful and diligent, and the appellees covenanted that he would be. If it were true that the Auditor's negligence made it imperative on Tate to steal, it might be, then, justly said that the appellees ought to be released. But the Auditor's negligence did not have this effect. It was the duty of Tate not to steal, notwithstanding the Auditor's and Secretary's negligence, &c., and the appellees covenanted that they would be responsible if he did. It was not the Auditor's and Secretary's faithful discharge of duty that was to guarantee that Tate would faithfully and diligently discharge his; but the appellees covenanted that they would guarantee that fact, and be responsible for his failure.

The Commonwealth, in investing the Auditor and Secretary of State with the powers above-mentioned, did not do so as a guaranty to the sureties of Tate that he would faithfully discharge his duties. If such had been the purpose, there would have been no need of

Tate's giving security for the faithful discharge of his duties; but the power was given to them as an additional guaranty to the people. Hence, the law required Tate to give bond, with sufficient sureties, that he would faithfully and diligently discharge his duties; and, not being satisfied with this security alone, additional safeguards were thrown around his official conduct in the way of preventing his stealing, and speedily detecting the same, as additional security to the people; and, as still an additional security to the people, bond, with sufficient sureties, was required of the Auditor that he would faithfully and diligently discharge his duties. We concede that these duties were mandatory upon the Auditor; but it does not follow that Tate's sureties are not also responsible, for both bonds were required as independent securities to the people. It was supposed that the Auditor might be faithless, negligent, or *particeps criminis* with the Treasurer, consequently he was required to give bond for the faithful discharge of his duties. Hence, it can not be said that he was the trusted agent of the State any more than was Tate. Each gave bond for the faithful and diligent discharge of his duties. Each covenanted to be faithful and diligent, independently of the action of the other. The State required this covenant. The fact that the Auditor or the Secretary was *particeps criminis*, even if such were the case, or was negligent, made Tate none the less a criminal, and his sureties none the less responsible for his defalcation. Tate was expressly informed by the statute that he must not obey the Auditor in the exercise of unlawful author-

ity, if he attempted it. Each bound himself that. he would do his duty, independently of the con- duct of the other. The law required this as inde- pendent and additional security to the people. The following language, in Taylor v. The Bank of Ken- tucky, 2 J. J. M., 569, is, as far as the principle is. concerned, applicable here: "Suppose these several agents combine to defraud their principal, is the one- excused by the fact that the other is *particeps?* Is the surety of one exonerated, because the other has. co-operated in the malfeasance? Or, suppose one con- nive at the fraud or improper conduct of the other, is the employer responsible because one of its agents. knew of the delinquency, and might have prevented its recurrence? If A employ an agent to transact par- ticular business, and exact from him security for his fidelity, and constitute another agent to perform other associate and supervisory functions, surely, if they both conspire to defraud their constituent, the secur- ity shall not be permitted to say that the act of the agent is that of the principal." It is clear, from what has been said, that the duties of the Auditor and Secretary did not form a part of the contract with Tate's sureties; nor did their conduct estop the State from proceeding against the sureties.

The pleadings concede that Tate was a defaulter prior to 1882; but it is denied that he committed any acts of defalcation in 1882 and 1883. It is alleged that he carried these prior defalcations over, and was. charged with the amount of them in his biennial set- tlement of the first Monday of January, 1882, which. went to make up the five hundred and twelve thou-

sand dollars, or the four hundred and eighty-two thousand dollars, supposed to be on hand, as cash, at that time. It is also alleged that the appellees are not responsible for the same. It was the duty of Tate to safely keep the public money in the Treasury, and not to apply the same to his own use, or to that of another, unless authorized by the warrant of the Auditor, and any such application would be an unlawful conversion, for which the sureties on the bond for that term would be liable, and he could not thus carry an account with the State over to the next term, and make his sureties of that term liable for it. The conversion occurred at the moment of the appropriation, and *eo instanti* the sureties on his existing bond became liable for it, and to make his sureties on a subsequent bond liable for it would be to make them liable for money not on hand at the time they became bound as sureties, nor that came to hand during said term.

After the appellant had concluded its evidence, the court instructed the jury to find for the appellees. This they did.

The record states that it contains all the evidence introduced or offered by the appellant. This statement complies with the law. But the record shows that the Auditor's books, Treasurer's books, the bank-books, Tate's reports to the Legislature, his stubs and pass-books, were all considered as read to the jury. The pass-books, however, were rejected as evidence. These books, &c., are not before the court, and the appellees contend that we must presume that they contained evidence that authorized the court to give

said peremptory instruction.  As said, it was admitted that Tate had committed defalcations, and the question was, whether or not he had committed them during his term of 1882 and 1883.  It is sufficient to say that the evidence tended to show that a part of the defalcations was committed during said term.  It has been held by this court time and again that if the plaintiff's evidence tends to make out his side of the issue, in whole or in part, it is the duty of the court not to take the case from the jury, but to let them pass upon the issue, although the court might be of the opinion that if there was a verdict for the plaintiff, it should be set aside.  Also, in such case the issue should be submitted to the jury, although, in the opinion of the court, the evidence on the other side was overwhelming.  The jury have the exclusive right to weigh and pass upon the evidence, and for the court to take the case from them because, in its opinion, the evidence on the one side overwhelms that on the other, would usurp the prerogative of the jury. We may presume that the books and other papers referred to would show all that is claimed; nevertheless, the appellant had evidence before the jury that tended to support its side of the issue, and contradictory of the books, &c.; and it was entitled to have the jury pass upon this conflict of evidence, although its evidence was weak and insignificant as compared with that which the books showed for the appellees.  Had the jury passed upon the issue, and the case were here for review upon a record that showed all the evidence used before the jury was not here, then we would presume that the absent evidence authorized

the verdict. The same rule obtains in trials by the court. But this rule does not obtain where the court has withdrawn the issue from the jury. In such case the only question is, was there evidence enough to entitle the party offering it to go to the jury. (Easley v. Easley, 18 B. M., 93.)

The Auditor's, Treasurer's and bank's books, including the pass-books, involving the Treasurer's official transactions that showed his defalcations, are a great many, and for a jury to be required to investigate the books, item by item, in order to determine whether there was a defalcation, and when, and to what extent, would devolve a duty upon them that they could not understand. Therefore, it would suggest of itself, at first blush, that persons who were competent to investigate and understand the books, and had investigated them sufficiently to explain them to the jury in reference to the question at issue, should be allowed to do so. Of course, he should be able to tell what the books show in reference to these questions, and he should refer to the books themselves if required to do so.

The pass-book, according to the proof, was regularly and accurately kept by Tate in connection with the discharge of his duties, and it was competent for it to go to the jury as a part of his official transactions in a contest with his sureties on his bond.

The judgment is reversed, and the cause is remanded with directions to grant the appellant a new trial, and for further proceedings consistent with this opinion.