**MARYLAND CASUALTY COMPANY,**
Appellant,

v.

**MAGOFFIN COUNTY BOARD OF EDUCATION, Appellee.**

**MARYLAND CASUALTY COMPANY,**
Appellant,

v.

**MAGOFFIN COUNTY, Appellee.**

Court of Appeals of Kentucky.

Sept. 29, 1961.

As Modified on Denial of Rehearing
June 22, 1962.

Stoll, Keenon & Park, Lexington, for appellant.

J. K. Wells, Paintsville, Earl Cooper, Arnett Mann, Salyersville, for appellees.

STANLEY, Commissioner.

In consolidated actions the trial court found that Hade Montgomery, former sheriff of Magoffin County, was short in his accounts as tax collector and was liable to (1) Magoffin County for $32,737, principal and interest, for the fiscal year 1955–1956, and (2) to the Magoffin County Board of Education for $25,636.95, principal and interest, for the fiscal years 1954–1955 and 1955–1956. The Maryland Casualty Company was surety on the several bonds. Default judgment was rendered against Montgomery for those sums in favor of the County and the Board of Education, respectively. Because of the limitations on the amount of the bonds, judgment on a trial went against the surety in favor of the County for $20,650 and in favor of the Board of Education for $23,114.95. The amounts include accrued interest on the defalcations.

Before assuming the duties of the office of sheriff on January 4, 1954, Montgomery executed a bond (a) in the penal sum of $5,000 for the faithful performance of his duties. This was the "General Bond of the Sheriff" required by KRS 70.020, but the terms of the bond carried the additional provision that the principal would "honestly account for all monies coming into his hands according to law." The bond covered the calendar year 1954. Another bond with the same terms (b) was executed in January, 1955, for $10,000. This covered the year 1955. Another bond (x) executed as of January 4, 1956, was for the period Jan-

uary 4, 1956, to January 4, 1957, to the Commonwealth for $10,000.

■ On May 20, 1954, a revenue collection bond (c) was executed for $15,000 to "Magoffin County, Commonwealth of Kentucky" covering the period from May 30, 1954, to May 30, 1955. The terms are identical with the foregoing general bonds (a) and (b). Another such bond (d) was executed May 30, 1955, for the ensuing fiscal year 1955–1956. These bonds were executed under the provisions of KRS 134.230, as amended in 1954. The provision in subsection (3) of that statute shows an intention that the bond shall be for the benefit of any taxing district, and it has been often held that the bonds cover county levies no less than the state revenue. Leslie County v. Maggard, 212 Ky. 354, 279 S.W. 335. KRS 134.250, entitled "Special County Levy Bond," also requires that the sheriff shall annually execute a bond to the Commonwealth covering the collection of the "County Levy." KRS 134.260 provides that subject to the provisions of KRS 134.270 the sureties on the sheriff's revenue bonds shall be liable for any default of the sheriff during the calendar year in which the bond was executed and not for any other year.

The appellant contends that it cannot be held liable for any defalcation of the sheriff under the general bonds, (a) and (b). If the contention is sound, the surety's obligation would be limited to $15,000 for each year, according to the revenue collection bonds, (c) and (d).

The appellant relies on Fidelity & Casualty Company v. Breathitt County, 276 Ky. 173, 123 S.W.2d 250, in which it was held, after a review of the several statutes and types of bonds, that the sureties on a sheriff's official bond were not liable for default in revenue collections when the sheriff had also executed revenue bonds. The question was very pertinent in that case, for the issue was contribution among different sureties on the general bond and the revenue collection bonds. The terms of the official bond followed the language of § 4556, Ky. Stats. (as a present examination of the record shows) and contained the provision that the sheriff "would pay over to such persons, and at such times as they may respectively be entitled to the same, all money that may come into his hands as sheriff." This was construed in the opinion as not including tax collections, for a revenue collection bond had also been executed. The present successor statute relating to the general official bond, KRS 70.020, does not contain such provision. It merely provides in general terms that the sheriff shall execute bond for the faithful performance of the duties of his office.

■ Neither of these general official bonds contains any reference to the statutes. Regardless of how they may be denominated—as general official bonds or revenue collection bonds—their real character and commitments determine the liability. Leslie County v. Maggard, supra, 212 Ky. 354, 279 S.W. 335. But, as a matter of fact, they contain the express assurance that the sheriff would "honestly account for all monies coming into his hands according to law." The obligation cannot be regarded as invalid or rejected as surplusage. In an earlier case it was held that the general bond with respect to tax collections was additional protection to that afforded by the revenue collection bonds. Fidelity and Deposit Co. of Maryland v. Commonwealth, 104 Ky. 579, 47 S.W. 579, 49 S.W. 467, 20 Ky.Law.Rep. 788, 1402. And it was held in Russell County Board of Education v. Leach, 288 Ky. 769, 157 S.W.2d 70, 72, following Fidelity Deposit Company of Maryland v. Brown, 230 Ky. 534, 20 S.W.2d 284, that the terms of § 4134, Ky.Stats. (which was part of the series of statutes relating to revenue bonds), which authorized the county court to require additional bonds and which provided that there should be no liability on the bond unless notice of default giving rise to a claim on the bond should be given within a certain time, were broad enough to cover "any and all bonds executed by the

sheriff." The applicable provisions of former § 4134, Ky.Stats., are now contained in KRS 134.230(4), 134.260 and 134.270.

■ It seems to us all of these bonds must be given the same legal effect.

But as the revenue collection bonds executed under KRS 134.230 et seq. are specific in their purpose as defined in the statute, we are of opinion that liability for failing to account for tax collections is primarily under such bonds. However, in case the liability stipulated in such bonds proves insufficient to cover the aggregate default of the obligee in tax collections, resort may be had to the general fidelity bonds executed under KRS 70.020, which the statute declares "shall be in addition to the bond required of him by KRS 134.230." In the present case the bonds executed under KRS 134.230 proved to be insufficient. Indeed, all of them together were not enough, for, as stated above, the judgments against the surety are about $15,000 less than against the sheriff personally.

The appellant contends that there was a shortage in the sheriff's accounts with the Board of Education for the year 1954–1955 of $16,116.44 and no notice thereof was given the surety within ninety days after the discovery. It therefore submits that it should be relieved of liability for that amount because of the failure to give timely notice. It claims also that it may not be held liable for all subsequent defaults, i. e., the shortages for 1955–1956, by reason of the concealment of the fact of the shortage, which misled the surety into executing the bonds for that subsequent year.

*The Board of Education case, 1954–1955 taxes.*

■ An obligee's compliance with a provision calling for notice of a claim within a specified time is regarded as a condition precedent to the recovery on the contract of suretyship. Jellico Grocery Co. v. Sun Indemnity Co. of New York, 272 Ky. 276, 114 S.W.2d 83; 72 C.J.S. Principal &

Surety § 253. It is made so by KRS 134.-270, reading:

"Neither the sheriff nor a surety shall be liable for any act or default of the sheriff in connection with his revenue duties unless notice of the act or default of the sheriff giving rise to a claim upon the bond has been given to the surety by the Department of Revenue, the county judge, the county attorney or other person asserting the claim within ninety days after discovery or at the latest within one year after the end of the year within which the bond was executed."

This section was a proviso in former § 4134, Ky.Stats. It came into the statutes in 1934. Ch. 20, Acts of 1934; Mt. Vernon Independent Graded School District v. Clark, 281 Ky. 230, 135 S.W.2d 892. Before that enactment, a like provision of limitation conditioned on the absence of stipulated notice included in a tax collector's bond was held not binding because in derogation of the statutory requirements. Bankers' Surety Co. v. City of Newport, 162 Ky. 473, 172 S.W. 940. None of the present bonds contain a similar condition as to notice, but the statutory provision is, of course, effectual.

The trial court found as a fact that a shortage occurred in the accounting of school funds for the fiscal year 1954–1955 in the sum of $15,256.07, but that it was not discovered until the completion of the audit in June, 1956, and thereafter proper and timely notice was given the surety. The court found another shortage in the school funds for the fiscal year 1955–1956 in the sum of $6,002.64. Timely notice of that default was given.

An entry on the record of the school board on June 29, 1955, recites that the board would "accept the figures of the sheriff as presented and any error * * * to be corrected and to not accept final settlement until the bill is paid, which appears to be according to the figures $16,116.44."

On July 14, 1955, Montgomery gave the treasurer of the board a check for that amount drawn on his account as sheriff. It bore the notation, "Amount to complete settlement of 1954–1955 tax collection." The bank refused payment on account of insufficient funds. (His balance was $3,-851.72.) This was reported to the board. The superintendent testified that he discussed the matter with the sheriff, who then claimed "he had made a mistake or something was wrong with the check." After holding the check for "perhaps a month or two," and being advised by the bank that there still were not sufficient funds on deposit to pay the check, the board turned it over to its attorney to collect. He appears to have taken no action.

On October 14, 1955, the sheriff gave another check for the identical amount of the dishonored one. It was not deposited until November 9. It was then paid. Thus the board generously favored the sheriff in his default for nearly four months. It is quite certain that the board knew at that time that the check was satisfied with 1955–1956 collections.

In December tax receipts seemed to be falling off, and then the board ordered an audit to be made of the sheriff's accounts. That was done in March and April, 1956. The audit revealed that the check for the balance of the 1954 taxes had been satisfied out of the 1955 collections. On April 17, 1956, the superintendent of schools wrote the surety company: "The Magoffin County Board of Education has been having difficulty in collecting their portion of the taxes from the sheriff of Magoffin County over a period of some two or three years." The letter enclosed a copy of the auditor's report showing a shortage for 1954 and 1955 of $25,256.36 and demanded payment thereof. This was the first notice the surety had of any default. It came *nine months* after the "cold check" had been given by the sheriff.

The superintendent testified that upon a chance meeting on the street soon after the incident he told the surety company's local agent in Salyersville about the dishonored check. The agent denied the conversation. The trial court did not accept or regard this as "notice of the act or default of the sheriff," for he placed his decision upon the ground that there had been no "discovery" until the filing of the audit of the sheriff's accounts.

■ The legal question is just what constitutes "discovery" of "any act or default of the sheriff in connection with his revenue duties," as stipulated in KRS 134.270, above quoted. The word "discovery" has, of course, many connotations and meanings. In relation to default of an insured person, the obligee in the bond, it is generally said, is not required to act until there is actual knowledge of a dishonest act or loss, mere suspicion thereof not being sufficient. See Shatz v. American Surety Co., Ky., 295 S.W.2d 809, at page 816. But, as said in Fidelity and Guaranty Co. v. Western Bank, 94 S.W. 3, 5, 29 Ky.Law Rep. 639, after suspicion is aroused, the obligee in the bond "ought to pursue its inquiries with reasonable diligence, and when satisfied that the defalcation exists, and the extent, or the substantial extent, of it, notice of the fact ought to be given promptly to the insurer." In that case there were several items of embezzlement by a bonded bank employee. On April 7, 1903, the bank's officers received information that aroused their suspicion concerning the employee's fidelity. But defalcation of an item of $1,459.43 was not definitely established until three or four days later, and then an effort was made to obtain a settlement. A thorough examination of the employee's accounts was then being made. The bond contained a provision that the employer should give notice to the insurer immediately upon discovery of any fraudulent act. We held that the failure of the bank to give notice of the default of the item until April 20 exonerated the surety from liability. To the same effect in principle is Jellico Grocery Co. v. Sun Indemnity Co. of New York, 272 Ky. 276, 114 S.W.2d 83, holding

that delay beyond the specified time for notice cannot be justified upon the contention that the extent of the loss had not been ascertained. Cogent reasons are given as to the fairness and importance of giving notice to the surety of any wrongful or dishonest act of a person whose fidelity has been guaranteed. See also 72 C.J.S. Principal and Surety §§ 150, 151; 50 Am. Jur., Suretyship, §§ 347, 348.

No comment need be added to the full recitation of the facts in this case except ·to say that to believe the Board of Education and its officials did not have any more than a suspicion of wrongdoing by the sheriff would distort reality. They had actual knowledge that the sheriff was guilty of a misappropriation of the revenue collections well within ninety days.

The effort of the appellees to avoid their dereliction in duty to the surety because there was a dispute as to the amount owing by the sheriff is strained and feeble. The only evidence of this is the sheriff's statement to them that he "made a mistake." Indeed, he did—in appropriating the tax money to his own use and giving the worthless check. There was no dispute about the amount owing at the time, for the exact sum was paid three months later without question.

The judgment for the Board of Education for the misappropriation of the 1954–1955 school taxes is erroneous.

### The Magoffin County case, 1954 taxes.

It appears that the sheriff was continually derelict in paying over what are called "Oil Run Taxes" and had been frequently reminded of it. On September 14, 1955, he gave a "cold check" to the county treasurer for $3,476.95, covering collections during the previous May. The treasurer, and perhaps the county judge, had "kept after" the sheriff to pay the sum, but he did not do so until January 20, 1956.

The trial court found the sheriff failed to account to the county for $28,592. This was discovered by the county officials on May 30, 1956, and timely notice was given the surety. The finding is too meager and indefinite to be of much assistance, but apparently the court regarded all of the shortage to have accrued in tax collections for 1955–1956.

Our foregoing decision as to the discovery of the "act or default" of the sheriff with respect to the school revenues is likewise applicable to his failure to pay over the May, 1955, county taxes, but here the terms of the statute as to timely notice were complied with.

### Liability for 1955 taxes.

■ We consider the surety's liability for shortages in the sheriff's accounts occurring after the execution of the bonds for the succeeding year. The appellant contends that the failure of the obligees in the bonds to reveal the previous defaults of the principal before allowing the surety to renew the bonds or to execute new ones for the ensuing periods entitles the surety to exoneration from liability under such renewed bonds as a matter of equitable estoppel. The rule to that effect is well recognized as applicable to private transactions or to fidelity bonds executed in the commercial world. Connecticut Mutual Life Ins. Co. v. Scott, 81 Ky. 540, 5 Ky.Law Rep. 639; Brunner v. City of Louisville, Ky., 311 S.W. 2d 402. See also 50 Am.Jur., Suretyship, § 328; 72 C.J.S. Principal and Surety §§ 77e, 150.

■ But there is an overriding public policy which makes a distinction between the action or nonaction of public officials when acting in a governmental capacity. That policy, in short, is that negligence or dereliction of public officials will not work an estoppel against the state or its several agencies and subdivisions. The principle rests upon the broad ground that the public is entitled to greater consideration in weighing the equities than where rights of individuals only are concerned. City of Paducah v. Gillispie, 273 Ky. 101, 115 S.W.

2d 574. The law is long established and deeply rooted in this and other states that, subject to special exceptions, the doctrine of equitable estoppel has no application to governments, municipal corporations and other agencies when their officials are acting in governmental capacities. Taylor v. City of LaGrange, 262 Ky. 383, 90 S.W.2d 357; City of Paducah v. Gillispie, 273 Ky. 101, 115 S.W.2d 574; Monticello Electric Light Co. v. City of Monticello, Ky., 259 S.W.2d 486; 19 Am.Jur., Estoppel, §§ 166, 167, 168; 31 C.J.S. Estoppel § 138. See Annotation, 1 A.L.R.2d 338.

The principle has been often applied to different states of fact. Of particular authority for holding in the present case that the surety is not discharged by the negligence or omissions of the public officials are Commonwealth v. Tate, 89 Ky. 587, 13 S.W. 113; Wade v. City of Mt. Sterling, 33 S.W. 1113, 18 Ky.Law Rep. 377; Fidelity and Deposit Co. of Maryland v. Commonwealth, 104 Ky. 579, 47 S.W. 579, 20 Ky. Law Rep. 788; Gay v. Jackson County Board of Education, 205 Ky. 277, 265 S.W. 772; Bennett v. County Board of Education of Harlan County, 273 Ky. 143, 116 S.W.2d 302; 67 C.J.S. Officers §§ 165, 171, Discharge of Sureties; 43 Am.Jur., Public Officers, § 427. The facts in Federal Surety Co. v. Board of Education of Marshall County, 222 Ky. 502, 1 S.W.2d 954, are strikingly like the facts in the instant case.

■ The act of the public officials in lulling the surety into renewing the sheriff's bonds for the following year by concealing the known facts of the previous defalcations is inexcusable from the standpoint of good faith and ethical conduct. It is defensible legally only on the ground that they were acting under the cloak of officialdom and the doctrine of public protection recited above. The appellee insists that the company voluntarily renewed the bonds without inquiry as to whether there had been any irregularity or dereliction on the part of the sheriff in accounting for taxes he had collected and should not be heard to complain. In the commercial world it is not necessary to enable a surety to avail himself of the defense of fraudulent concealment that the obligee should have actively solicited the surety to become bound on the bond. Bellevue Building & Loan Association v. Jeckel, 104 Ky. 159, 46 S.W. 482, 20 Ky.Law Rep. 460. But the surety company knew, or should have known, that equitable estoppel has no application to public officials, as above declared, and governed itself accordingly.

The surety cannot, therefore, be relieved of liability for the failure of its principal to account for taxes collected for the year 1955–1956.

There is a difference here from the officials' omission to give notice within ninety days of the 1954 defalcation. Here the concealment of the previous default did not violate a statutory duty or a condition precedent to recovery on the contract of suretyship, a provision which is consonant with public policy. Wilhoit v. Furnish, 295 Ky. 356, 174 S.W.2d 515, 149 A.L.R. 941.

To the extent of the $16,116.44, the amount adjudged for the year 1954–1955 shortage, the judgment is reversed. To the extent of the balance of the judgment, i. e., for taxes collected for the year 1955–1956, the judgment is affirmed.

MOREMEN, STEWART and PALMORE, JJ., dissenting.

PALMORE, Judge (dissenting in part).

The doctrine that in their dealings with the public the arms and agencies of the state are held to different and lower moral standards than those that are binding upon everyone else is an offensive anachronism. If it cannot be defended from the standpoint of good faith and ethical conduct, as the majority opinion admits, then it is an ugly parasite on the face of the law and ought to be removed. As the rule was created by the courts in the first place, and continues in force by no other authority, it is right and proper that the injus-

tice be likewise corrected by the courts. I therefore dissent from that portion of the foregoing decision which holds the principle of estoppel inapplicable to the acts of public officials.

STEWART and MOREMEN, JJ., concur in this dissent.