THE STATE OF KANSAS, *Appellee*, v. THE UNITED STATES FIDELITY AND GUARANTY COMPANY, *Appellant*.

No. 16,282.

SYLLABUS BY THE COURT.

1. LIMITATION OF ACTIONS—*Appeal by a Surety Bond Company*. Under section 535 of the General Statutes of 1901 the failure of a bonding company to pay a judgment rendered against it, from which no appeal is taken within sixty days, operates as a forfeiture of the right of the company to do business under the act, but does not preclude the taking of an appeal after the prescribed time.

2. ESTOPPEL—*Surety on Bond of State Depositary—Denial of*

The State v. Guaranty Co.

· *Facts Recited in the Bond.*  In pursuance of chapter 41 of the Laws of 1891 a bank was designated by the state treasurer as a depositary for the collection of drafts, checks and certificates of deposit that might come into the state treasurer's hands on account of any claims due the state, and it gave a bond, signed by the appellant as surety, reciting its designation as a depositary for the foregoing purposes, and also containing the condition that it would "promptly collect all drafts, checks and certificates of deposit that may be delivered to it by the state treasurer for collection and shall safely keep the proceeds of all such collections and promptly pay the same on the state treasurer's order," and afterward the bank made default and failed to pay upon the orders of the state treasurer.  *Held,* that the surety of the defaulting bank is estopped to deny the facts recited in the bond, including the recital that the bank was duly designated, that the drafts, checks and certificates mentioned in the bond were delivered to it for collection and that it undertook to collect all drafts, checks and certificates delivered to it arising from any claims due the state, and is also estopped to deny that the depositary act is valid.

3. ——— *Surety Not Released by Illegal Agreement between Depositary and Treasurer—Improper Use of Funds.*  The surety on the bond of the depositary bank will not be heard to say that there was an illegal agreement between the bank and the treasurer that state funds should remain in and be used by the bank for long periods of time after collections were made, nor will any improper action of the bank in keeping the accounts of the state or in handling the deposits lessen the liability of the surety.

4. BONDS—*Common-law Obligation.*  The bond in question, if not in strict compliance with the statute, has all the elements and binding force of a common-law obligation, and, the bank having by means of the bond secured possession of the state funds, neither it nor the surety can escape liability for non-performance of the conditions of the bond.

5. ACCOUNTS — *Application of Payments — Secured and Unsecured Debts.*  In running accounts where there are items of debit and credit and there has been no appropriation of payments by the parties the ordinary rule is that the first debit items are extinguished by the first credit items, but that is subject to the other rule that where a debtor owes debts, some secured and others unsecured, and neither debtor nor creditor has directed the application, the law will apply the payments on the unsecured debts.

6. INSTRUCTIONS — *Computation of Interest — Incorrect Rule Beneficial to Complaining Party.* The fact that the court gave the jury an incorrect rule for the computation of interest is no ground for reversal where such rule operated to the benefit of appellant and necessarily made the award of the jury less than it would have been under the correct rule.

Appeal from Shawnee district court; ALSTON W. DANA, judge. Opinion filed February 12, 1910. Affirmed.

*R. W. Blair, H. A. Scandrett,* and *B. W. Scandrett,* for the appellant; *N. H. Loomis,* of counsel.

*Fred S. Jackson,* attorney-general, *J. W. Gleed, F. L. Williams,* and *J. L. Hunt,* for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This action was brought by the state against the United States Fidelity and Guaranty Company on a bond given by the First National Bank of Topeka, as a depositary of state funds, and signed by the defendant company as surety. At the general election in 1902 T. T. Kelly was chosen as state treasurer, and he took possession of the office on January 12, 1903. Among his first official acts he designated the First National Bank as a state depositary, and on January 20, 1903, the bank gave to the state a bond in the sum of $250,000, signed by the defendant company as surety, which was approved by the executive council on January 28, 1903. This bond recited that the bank had been designated "as a depositary for the collection of drafts, checks and certificates of deposit that may come into his [the state treasurer's] hands on account of any claims due the said state of Kansas," and it provided that if the bank "shall promptly collect all drafts, checks and certificates of deposit that may be delivered to it by the state treasurer for collection and shall safely keep the proceeds of all such collections, and promptly pay the same on the state treasurer's order, and if all drafts that may be issued to said state treas-

urer by it shall be paid, then this obligation to be void; otherwise to remain in full force and virtue." On January 13, 1903, Kelly deposited with the bank a check for $155,385.87, representing money of the state turned over to him by his predecessor, and on that date he opened an account with the bank in his own name, as state treasurer, by depositing other paper, which with the check mentioned aggregated $235,256.79. He continued to deposit paper belonging to the state from day to day until April 14, 1905, when the last deposit was made. This paper included checks, drafts, certificates of deposit and warrants, representing money due the state as taxes, some due from the municipalities of the state, and some derived from fees collected by the insurance and other departments of the state. The bank failed, and on July 3, 1905, a receiver was appointed. At that time the state had on deposit in the bank $547,-575.06. Of this amount the receiver has paid to the state $448,859.11, leaving a balance of $98,715.95, which, with interest as computed, amounts to $139,-003.06. Verdict was returned and judgment given for this amount, and from the judgment the company appeals.

The state made a motion to dismiss the proceeding on the ground that the company had not taken an appeal, writ of error or supersedeas within sixty days after the rendition of the judgment against it. The motion was denied some time ago, but the writing of an opinion disposing of it was deferred until the final decision on the merits of the case. The motion was based on section 535 of the General Statutes of 1901, which provides that the neglect or refusal of a bonding company to pay a judgment rendered against it on its bond, from which no appeal is taken within sixty days, shall operate to forfeit its right to do business under the act. The appeal in the present case was not taken within the prescribed time. While the act does not in express terms deny the right of appeal to a company which fails to

pay a judgment in time, it is contended that under the decisions of *Modern Woodmen v. Heath,* 71 Kan. 148, and *Daughters of Justice v. Swift,* 73 Kan. 255, it must be held to have that effect. These decisions were based upon an insurance statute which in most respects is like the one governing bonding companies. However, there is a difference between the provisions. The insurance statute provides that a fraternal benefit society which fails to pay any judgment rendered against it *"in any court in this state,* unappealed from, within sixty days from the rendition of such judgment, . . . shall be excluded from doing business within this state." (Gen. Stat. 1901, § 3580.) The act in question is that if a bonding company shall fail to pay *any final judgment* against it, from which no appeal, writ of error or supersedeas has been taken within sixty days after the rendition of the judgment, it shall forfeit its right to do business.

The decision in *Modern Woodmen v. Heath,* supra, pushed interpretation to the limit, and while that decision and the one which followed it are adhered to, the court does not feel justified in extending them farther, under a different and more limited statute. The language in the insurance statute, "any court *in* this state," clearly means "any court *of* this state," because just preceding it in the same section there is a provision relating to the removal to the federal court of a suit commenced "in any of the courts *in* this state." The same language is used in section 534 in the same connection. The insurance statute was enacted in 1898 and the bonding company act in 1895. The difference in the language is significant. In one case it refers to a final judgment of a *state* court, in the other to a final judgment in *any* court. The legislature can restrict the period within which steps may be taken to review a judgment in a state court, but can not regulate appellate procedure in the federal courts. It can reasonably be supposed that the legislature intended a limit

when it was referring to state courts, but it can not be thought to have intended that when it was referring to judgments generally. The context clearly shows that the words "in this state" were inserted in the insurance statute to show that the provision was not intended to apply to federal courts. If any one desired to sue an insurance company in the federal court he thereby waived the benefit of the sixty-day provision. If he chose the state court the statute preserved the right to him by forbidding a removal to the federal court. It is equally clear that in the bonding company act the sixty-day provision refers to both state and federal courts. In view of the differences between the two statutes the decisions referred to are not controlling, and it can not be held that the neglect or refusal of a bonding company to pay within the prescribed time shall be visited with any other penalty than a forfeiture of its right to do business under the act. The motion was therefore denied.

In behalf of the appellant it is contended that its demurrer to the evidence should have been sustained, and that its motion, made at the close of the testimony, to direct a verdict in its favor should have been allowed. Several reasons are urged why these rulings are erroneous. One is that under the national banking laws the bank was without corporate power to assume the obligations written in the bond to pay the state the full amount of all collections it should make. Another is that under the depositary act, which it contends must be read into the contract of the surety, provision was only made for the collection of paper due the state for taxes, and that as other deposits were made and mingled with the money derived from taxes and no showing was made as to the particular amount due for taxes there was no basis for a verdict. Another reason urged for reversal is that the deposits were not for collection, but were allowed to remain in the bank in-

definitely, to be checked out by the treasurer the same as any ordinary commercial deposit, when the law contemplates that the paper shall be promptly collected and the money promptly withdrawn and placed in the vaults of the state treasury; and that in this case the money was allowed to remain in the bank for long periods, under some unlawful arrangement between the bank and the treasurer, the extent of which the appellant was not permitted fully to inquire into on cross-examination of the state treasurer.

It appears that when checks, drafts and other paper were received by the treasurer they were deposited in the bank, with the understanding that the bank should have about ten days to make the collection, and if not then notified to the contrary the treasurer could assume that the collection had been made, and the amount was then charged against the bank and a receipt sent to the party from whom the paper was obtained. The money collected remained in the bank until the treasurer drew orders for such sums as were necessary to meet the expenses and demands of the state. The contention is that the arrangements and practices in respect to these state funds, as between the treasurer and the bank, were illegal, and therefore not binding on the surety. If instead of depositing the money for collection, as the law contemplates, it was in fact allowed by the treasurer to remain in the bank for long periods, and a consideration was paid for its use, as appellant sought to show, may the bank set that up as a defense when the state demands payment of the money which the bank has collected and holds, or is it any reason why the appellant should escape liability on the obligations written in the bond which it signed? The depositary bank was an official agent of the state—an agent which has been designated as a quasi-public official. (*Snattinger v. Topeka,* 80 Kan. 341, 345.) The bond was given to protect the state as against official delinquency. The extent of the obligation of the surety is written in the

bond.  There is no provision in it by which the state binds itself that the treasurer or the bank shall faithfully follow the law.  The main reason for requiring a bond is to guard against possible defaults and the neglect or misconduct of officers.  Under the law deposits of drafts, checks and certificates of deposit belonging to the state might be made by the treasurer in the bank for collection and not as a general deposit or as a loan.  (Laws 1891, ch. 41, §§ 2, 3.)  The bank undertook to make collections for the state and not to hold and use state funds as a borrower.  If the bank made an improper use of the funds, with or without the consent of the treasurer, it will not avail the surety. Its liability is not contingent upon the neglect of the treasurer or the legality of his action.  Mr. Justice Story, in speaking of the rule that the neglect of an officer is not imputable to the government, said :

"The government can transact its business only through its agents; and its fiscal operations are so various, and its agencies so numerous and scattered, that the utmost vigilance would not save the public from the most serious losses, if the doctrine of laches can be applied to its transactions.  It would, in effect, work a repeal of all its securities." (*U. States v. Kirkpatrick*, 22 U. S. 720, 735.)

The case of *Manley v. City of Atchison*, 9 Kan. 358, was an action against a defaulting city treasurer.  He had been appointed under an agreement with the city council that he should serve without compensation and pay seven per cent interest on the current funds of the city in his hands.  On the trial the sureties on his bond set up the excuse, and tried to show, that the city was in complicity with the treasurer in an unlawful arrangement, and that, the council having authorized the treasurer to use funds in his private business with their knowledge, they were not held for any loss.  The court ruled that the illegal acts of the council did not excuse the illegal acts of the treasurer; that the law

prescribed the duties of each; when either went outside of the law the act, as to the city, was inoperative and void; that the law and the bond required the treasurer safely to keep the funds for public purposes—and that the council could give him no right to use them for any other purpose. In the opinion it was said:

"He got his power by his appointment; but his duties were defined by law, and were not a subject of bargain and trade between himself and the mayor and council. Their consent or agreement that he should use the funds in his business gave him no right so to do. An illegal contract could not enlarge the power of the city treasurer; neither could it limit his responsibility. That the illegal contract was made with the other agents of the city does not change the principle, nor alter the duties and obligations of the treasurer. They remained the same, and were defined by law. Any other conclusion would lead to endless confusion, and often end in ruin to cities. The whole fallacy of the argument of the plaintiffs in error lies in confounding the mayor and council of the city with the city itself. Although their powers are greater, they are no more the city than is the city marshal, or the city attorney; and either of these officers would have had as much right to make the contract with the treasurer, such as was attempted to be proven in this case, as had the mayor and council;  .  .  .  the contract or agreement sought to be proven in nowise lessened the obligation of the treasurer; neither did it affect the liability of his sureties." (Page 365.)

The same question was involved to some extent in *Loper v. The State,* 48 Kan. 540, where an illegal arrangement was made as to the deposit of county funds and the county commissioners had contributed to it by failing to designate a depositary. The sureties on the bond of the defaulting treasurer, who under the arrangement had the use of the public funds, set up as a defense the neglect of the commissioners. In response to this the court said:

"Parties can not make an arrangement favoring the violation of a statute regulating the duties of a public

officer, and, having obtained an advantage or profit thereby, ask that their liability upon the official bond of such officer be lessened or discharged because the statute was not complied with." (Page 553.)

(See, also, *Rose v. Douglass Township*, 52 Kan. 451; *Hart v. United States*, 95 U. S. 316; *Board of County Commrs. v. Security Bank*, 75 Minn. 174; *Estate of Ramsay v. The People*, 197 Ill. 572; *Stoeckle, et al. v. Armstrong, et al.*, 8 Del. Ch. 150; *Anderson v. Blair*, 121 Ga. 120; *State v. Pederson*, 135 Wis. 31; *Commonwealth v. Tate &c.*, 89 Ky. 587; 27 A. & E. Encycl. of L. 544.)

The bank knew the scope of the duties and powers of the state treasurer, knew that he had power to deposit drafts, checks and other paper for collection only, and it could not by its methods of bookkeeping or of handling the deposits, or by any arrangement it might make with the treasurer, limit its responsibility to the state; and the surety is in no better position. It is argued that only drafts, checks and certificates of deposit for taxes were in the contemplation of the parties; that the provision for the appointment of a depositary is part of an act relating to taxation, and that because of the restricted title of the act its provisions can only apply to drafts, checks and certificates of deposit derived from taxes, and if any of the provisions are broad enough to cover more than these it is necessarily unconstitutional. These contentions, however, are hardly open to appellant. The recitals in the bond, as we have seen, do not limit the deposits to be made with the bank to drafts and other paper of the state arising from taxes. These recitals are binding on those who signed the bond, and the appellant is therefore estopped to deny that the bank had been designated "as a depositary for the collection of drafts, checks and certificates of deposit that may come into his [the state treasurer's] hands on account of any claims due the said state of Kansas." After reciting that the bank had been so designated for

the collection of paper delivered to it "on account of any claims due the said state of Kansas," the bond recited the condition that the bank "shall promptly collect all drafts, checks and certificates of deposit that may be delivered to it by the state treasurer for collection and shall safely keep the proceeds of all such collections, and promptly pay the same on the state treasurer's order." Having solemnly alleged these facts in the bond which it signed, and having thereby enabled the bank to obtain possession of the funds of the state arising from other sources than taxes, the appellant is estopped to deny the existence of any of the relevant facts recited. It will not be permitted to deny that the paper was delivered to it for collection, nor that the bank undertook to collect paper derived from sources other than taxes, nor that the depositary act is valid. (*Snattinger v. Topeka*, 80 Kan. 341.)

The effect of a recital in a bond was before the supreme court of Minnesota in *Jefferson v. M'Carthy*, 44 Minn. 26, where it was said:

"It is well settled that an allegation or recital in a bond, which is certain in its terms and relevant to the matter in hand, is conclusive between the parties to a controversy growing out of the instrument itself, or the transaction in which it was executed." (Syllabus.)

In *Board of Co. Commrs. v. American L. & T. Co.*, 75 Minn. 489, the bond recited that a trust company had been duly designated as a depositary of county funds. A question arose as to whether there had been a legal designation. The bond, however, was approved, and the treasurer deposited the funds of the county with the trust company. It was held that the recital in the bond was an admission that the company had been designated as a depositary, and it was further said that "if the bond was approved, and thereupon the money of the county was deposited  .  .  . under the bond, the sureties, as against the county, would be estopped to deny that the trust company had been des-

ignated a depositary and received the money as a *de facto* depositary, at least." (Page 493.) In volume 1 of the third edition of Brandt on Suretyship and Guaranty, section 52, it is said:

"The general rule is that sureties are estopped to deny the facts recited in the obligations signed by them, and this whether the recitals are true or false in fact. Having once solemnly alleged the existence of the facts they can not afterward be heard to deny it."

In *Blaco v. State,* 58 Neb. 557, sureties who signed an official bond attempted to show that the office to which their principal had been appointed was unconstitutional, and that court held that "having by their voluntary act secured to Hilton the fruits of the law, which was constructively incorporated into the bond, they are now, by a plain principle of justice, forbidden to deny that the law was constitutionally enacted." (Page 562.) The same question was raised in *Thompson v. Rush,* 66 Neb. 758, where it was stated that "the rule seems to be settled, upon authority, that sureties upon a bond will not be permitted to deny facts recited in the instrument which they have signed." (Page 763.)

(See, also, *Simpson v. Greeley,* 8 Kan. 586; *Sponenbarger v. Lemert,* 23 Kan. 55; *Haxtum v. Sizer,* 23 Kan. 310; *Red Wing Sewer Pipe Co. v. Donnelly,* 102 Minn. 192; *County of Meeker v. Butler,* 25 Minn. 363; *Greengard v. Fretz,* 64 Minn. 10; *Board of County Commrs. v. State Bank,* 64 Minn. 180; *Gray et al. v. The State, ex rel. Mills,* 78 Ind. 68; *Buhrer v. Baldwin,* 137 Mich. 263; 32 Cyc. 69.)

Under the rule of the authorities appellant is precluded from denying the authority of the bank to execute the bond or that it is binding according to its terms. It is contended, however, that estoppel was not sufficiently pleaded to make the principle available to the state as against appellant. While the state did not explicitly aver that the facts stated operated to estop

appellant from denying liability on the bond, all of the facts necessary to sustain an estoppel were set forth in its pleadings. The facts out of which estoppel arose having been pleaded, it was not essential to state the legal conclusions which followed or the consequences to be drawn from them. (*Anderson v. Walter*, 78 Kan. 781, 784.) Under the pleadings testimony to establish estoppel was received, and this claim was not inconsistent with the other positions taken by the state.

The point insisted on that the bank was only a collector and that moneys when collected should be withdrawn at once and held in the state treasury is hardly supported by either the provisions of the statute or the recitals in the bond. In addition to the requirement that the depositary shall promptly collect the paper delivered to it by the state treasurer the statute provides for the "safe-keeping" (Laws 1891, ch. 41, § 2) of the funds which it collects. It also provides for the prompt payment of the same on the state treasurer's order, but it does not specify when such order shall be drawn. The bond in terms stipulated that the bank should safely keep the collections made, and this condition is as important as the one providing for prompt collections. It contained no limitations upon the time the funds collected by the bank should be safely kept, and the ordinary interpretation of such language would be that the bank should safely keep the moneys until they were withdrawn under the state treasurer's order. If that officer transgressed the law by failing to withdraw such moneys when collected, that fact, as we have seen, does not avail the surety. It may also be said that if the bond does not strictly follow the requirements of the statute it has the elements and binding force of a common-law obligation. It was voluntarily given, upon sufficient consideration, and is not prohibited by statute or against public policy, and when the bank by means of the bond secured possession of the state funds neither it nor the surety can well escape liability for nonperformance of the conditions of the bond.

There is a contention that the appellant was held for deposits made when the bond was not in force, both before the bond became effective, at the beginning of the account, as well as after it was nullified by the repeal of the statute under which the bond was given. Considerable sums were deposited in the bank between the time of designation and the execution and approval of the bond. As to these it is argued that under the decisions upon bonds given by county depositaries the bond in question must be held to be retrospective in character and to cover all deposits and collections due the state when the bond was executed and approved. (*Brown v. Wyandotte County,* 58 Kan. 672; *Myers v. Kiowa County,* 60 Kan. 189.) It is unnecessary to place the liability of the surety on this ground. If these deposits are outside of the bond and unsecured, the doctrine of the application of payments, when applied, will bring the same result. It is contended, however, that the court erred in charging the jury in respect to this rule. First, it may be said that the legislature of 1905 changed the policy of the state in regard to the deposit of public funds and the act providing the new plan contained an express repeal of the former statute. (Laws 1905, ch. 471, § 19.) On one side it is contended that the repeal of the statute on March 18, 1905, ended the right of the treasurer to make deposits and there could be no liability on the bond for those made after that time. On the other side it is contended that the legislative intention must have been to continue the old law in force (as it furnished the only machinery for obtaining funds from county treasurers) until the machinery of the new law could be put into operation, and that was some time after August, 1905, and they cite *The State v. Harsha,* 80 Kan. 72. Granting that the act was repealed, as contended, and that the deposits made after March 18, 1905, are not secured by the bond, they are not included in the verdict under the rule of the application of payments. The court instructed the jury in

43—81 KAN.

substance that when a debtor owes debts, some secured and some unsecured, and makes payments without specifying what debts he intends to pay, the law will apply the payments on the unsecured debts. When the account of deposits and payments made after March 18, 1905, is cast up, and the rule mentioned applied, the amount awarded is found to be covered by the bond. It is argued, however, that the court gave contradictory and confusing instructions, by stating the rule of "first in first out," or that the first credit items are applied to the earliest debit items, and then giving the other rule respecting the application of payments to secured and unsecured debts. The court told the jury that the ordinary rule in running accounts was that the first credit items extinguished the first debit items, but after stating the ordinary rule gave the additional one, based on equitable grounds, that payments in certain cases should be applied on the unsecured rather than on the secured debts. In effect the jury were instructed that if the account was found not to embrace secured and unsecured debts, and the equitable grounds did not exist, the first, or ordinary, rule should be applied; but if there were secured and unsecured debts in the account, and no appropriation of payments by the parties, then the second rule should be applied. There was practically no dispute in the facts in this respect and no danger of misleading the jury. This rule was adopted and applied in an early case in this state, and it seems to be the one applied by all courts, except in a few states where the civil-law rule has been adopted. (*Shellabarger v. Binns,* 18 Kan. 345 ; 30 Cyc. 1246.)

There is complaint, too, that the court advised the jury that as there were partial payments they should compute interest under the mercantile method rather than under the United States rule, which has received the sanction of this court. (*Christie v. Scott,* 77 Kan. 257.) The rule applied by the court, however, operated to reduce the amount of the debt, and having resulted

in benefit rather than injury to appellant there is no reason to complain.

A number of objections to rulings upon the admission of evidence have been argued, but the view which has been taken of the case renders them immaterial, and the same may be said of other objections to the instructions. All have been examined and none found to be prejudicial, nor do we discover any grounds for a reversal of the judgment. It is therefore affirmed.