No. 29,301.

THE BROWN-CRUMMER INVESTMENT COMPANY, *Appellee*, v. THE
BANKERS SERVICE COMPANY, THE AMERICAN BANKERS INDEMNITY
ALLIANCE, and THE GUARANTEE TITLE AND TRUST COMPANY, *Appellants*.

(287 Pac. 579.)

Opinion filed May 3, 1930.

*E. L. Foulke, J. B. Nash, Roy H. Wasson,* all of Wichita, *John H. Atwood, Price Wickersham, Oscar S. Hill* and *Clarence C. Chilcott,* all of Kansas City, Mo., for the appellants.

*Thomas E. Elcock, James G. Martin, Austin M. Cowan, Chester I. Long, J. D. Houston, Claude I. Depew* and *W. E. Stanley,* all of Wichita, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one on a contract of indemnity which served as a policy insuring plaintiff against loss through abstraction and wrongful appropriation by the cashier of the bank, of bonds on deposit in the American State Bank of Wichita. The defense was that if liability on the policy accrued the liability was subsequently

extinguished. The court stated findings of fact and conclusions of law, and rendered judgment for plaintiff. The insurers appeal.

Plaintiff was a dealer in bonds at Wichita and did its banking business with the American State Bank. Plaintiff had a general agreement with the bank reading as follows:

"*American State Bank, Wichita, Kansas.* MARCH 24, 1922.

"GENTLEMEN—We hereby agree to repurchase from you upon demand any of the municipal or government bonds, warrants or other securities which you may be carrying for us from time to time, paying for same par and interest, to be computed at the rate of six (6) per cent, upon such funds as we may use. and we are to receive the coupons from the bonds as they mature.

"On certificates of deposit having a definite maturity we are to receive interest at the rate of four (4) per cent.

"Yours very truly, R. E. CRUMMER, *Vice President.*"

Particular transactions were evidenced by writings applying to them, and this litigation may be traced to the following letter, pursuant to which plaintiff delivered to the bank bonds of the par value of $150,000:

"*American State Bank, Wichita, Kan.* FEBRUARY 9, 1923.

"GENTLEMEN—We are handing you herewith $150,000 par value municipal bonds, payment for which we acknowledge, and which we agree to repurchase upon your or our demand at par, plus six per cent interest from this date.

"Yours truly, H. M. DOBBIN, *Cashier.*"

The two instruments, whether read together or separately, show they were not contracts to buy from the bank as owner bonds previously delivered to the bank by plaintiff. The nature of the use, in fact, made of the instruments was described by witnesses. Description of the practice disclosed the writing dated February 9 constituted a memorandum of pledge of bonds as security for a loan of money payable on demand of either party.

Among the bonds pledged pursuant to the "loan letter" of February 9 were bonds of Hill county, Montana, of the par value of $28,000. The loan was paid by plaintiff in three payments of $50,000 each, made on February 10, February 14, and February 26. On final payment the loan letter was stamped paid. The Hill county bonds remained on deposit in a special place in the vault of the bank, which was a recognized place of safe deposit under the terms of the insurance policy. Afterwards Phil Drumm, cashier of the bank, asked plaintiff's permission to use plaintiff's bonds as collateral security for loans to the bank by its correspondents. Permission to do this was denied because plaintiff might need the bonds

at any time. About April 9 Drumm did hypothecate the bonds to the National Bank of Commerce of St. Louis, Mo. Early in June plaintiff requested the bank to deliver the bonds at plaintiff's branch office in Kansas City, Mo. On June 9 the bonds arrived there, with a draft attached in favor of the St. Louis bank for $28,000. Plaintiff had no previous knowledge of misappropriation of the bonds. Plaintiff directed its Kansas City office to take up the St. Louis draft by draft on plaintiff, which was paid by plaintiff on June 12. By this means plaintiff regained possession of its bonds.

Proof of the foregoing facts established liability to plaintiff on the insurance policy. The bonds had been unlawfully abstracted, plaintiff was compelled to pay $28,000 to obtain possession of them, and a cause of action on the policy for the amount of the loss arose. This brings us to the defense—that the liability was discharged by subsequent course of dealing between plaintiff and the bank.

On June 12 Hoffman, then cashier for plaintiff, demanded of Drumm that plaintiff be given credit for $28,000 on the books of the bank. Drumm promised to give the credit, and Hoffman charged the bank with the amount on plaintiff's books. On June 16 Hoffman discovered Drumm had not given plaintiff credit on the books of the bank. Pursuant to personal interview at the bank on that day between Hoffman and Drumm, Drumm entered the amount on plaintiff's pass book, and made out a deposit slip from which an entry of credit was made on the books of the bank.

Plaintiff's account on the books of the bank shows debits and credits on June 11, 12, 13, 14, 15, 16 and 18. June 17 was Sunday. The bank was closed by the bank commissioner on the morning of June 19, before it opened for business. When the bank closed plaintiff had a large credit balance. The aggregate amount included the $28,000 item. The assets of the bank were exhausted, the state bank guaranty fund was insolvent, and after distribution of assets plaintiff still had an unpaid balance due it of $16,618. Plaintiff was given judgment for that amount.

Drumm's promise of June 12 to give plaintiff credit for the value of the bonds made no funds available to plaintiff whereby plaintiff might recoup its loss. Concerning the entry made on plaintiff's books, Hoffman testified as follows:

"Q. Now then, you demanded credit for Brown-Crummer of the bank for that particular item of $28,000, didn't you? A. Yes.

"Q. And you told the man that 'you hadn't any business selling my bonds'? A. Yes.

"Q. And he told you some story that didn't suit you, and you said, 'I want credit for them'? A. Yes.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. And so then you, immediately following that conversation, made the entry on your books of $28,000 as a charge against the bank? A. Yes.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. You wanted to get payment of the $28,000 that you had paid out for the purpose of getting your bonds back. That was the purpose of that telephone? A. Yes.

"Q. You had your conversation with Drumm, and as a result of that conversation you then put that entry on Brown-Crummer's books, taking credit for $28,000? A. No; the conversation didn't have anything to do with my books. It was Drumm I was hollering at.

"Q. I say, as a result of that conversation you entered it on your books? A. No; it wouldn't be the result of the conversation; I would make that entry anyhow.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Now then, you were taking credit on your books because of the agreement that you had with Drumm, weren't you? A. No.

"Q. What were you taking it for? A. Because Drumm owed it to me.

"Q. Drumm owed it to you? A. Yes.

"Q. And he agreed to pay it to you? A. Yes.

"Q. And that is why you were taking credit on your books? A. Drumm didn't have anything to do with my books.

"Q. Why were you taking credit, I am asking you? Why were you taking credit on your books? A. Because the bank owed it to me. It didn't make any difference whether I agreed with Drumm or not. He didn't have anything to do with it.

"Q. You wouldn't put it there, would you? A. Where else would I put it? Where else would I put it?

"Q. You knew before you telephoned to Drumm that you were making a—going to make claim against him for $28,000 for having sent your bonds down to St. Louis? A. Yes.

"Q. . . . And you made the entry because of the conversation you had with Drumm? A. No.

"Q. Why didn't you make the entry before you telephoned to Drumm, then? A. Well, I don't know. . . . It wouldn't change the entry whether I talked with him before or after. . . . I made that entry on my books to offset this draft."

The court made the following finding of fact:

"As a matter of bookkeeping and for information of his own company, Hoffman made an entry on the books of the Brown-Crummer company of a credit of $28,000, and debited the American State Bank in like amount. Nothing was said as between Hoffman and Drumm as to this entry."

The finding was plainly based on Hoffman's testimony, is fully sustained by that testimony, defendants introduced no evidence at the trial, and the finding is conclusive here.

Because plaintiff would issue checks which would not appear at the bank for many days, and because the bank did not always enter deposits on its own books the day they were made, the daily balances of the two sets of books would not agree. It so happened that on June 12 plaintiff's own books showed its bank account was overdrawn. The fact, however, is not of the slightest consequence. No matter what plaintiff's books might show, nothing whatever had occurred which could operate to discharge the bank's liability for misappropriating the bonds. The result is, Hoffman's entry on plaintiff's books, and the state of plaintiff's account as shown by plaintiff's books, are details of the narrative of the case without legal significance.

At the trial the bank books containing plaintiff's account disclosed the following:

| "Date. | Debit. | Credit. | Balance. |
|--------|--------|---------|----------|
| June 11 | | | $37,902.01 |
| June 12 | $97,091.63 | | 59,189.62 (red) |
| June 12 | | $94.55 | |
| June 12 | | 3,313.92 | 55,781.15 (red) |
| June 12 | | 40,000.00 | |
| June 12 | | 15,071.00 | |
| June 12 | | 3,000.00 | 2,289.85" |

The debit on June 12 was for a cashier's check issued to plaintiff which was not cashed, and which was returned on June 16. The red balances were not true balances. The item of $40,000 was in fact deposited by plaintiff on June 10, and entered by the bank on plaintiff's pass book. Evidently the deposit slip for the $40,000 credit was not written up for two days. There was evidence that there is no way to tell, from entries on the bank's books, what items, whether debit or credit, in fact came first in the course of a day's business. Therefore it is not conclusive from the bank's books that plaintiff was in fact overdrawn at any time during the hours the bank was open on June 12. When the day closed plaintiff had a balance. If plaintiff had received credit for $28,000 the balance would have been that much greater. That credit had not been given. On June 12 plaintiff got nothing whatever from the bank, whether money or credit, by way of reimbursement for the loss

consequent upon the unlawful abstraction of the bonds, and the state of plaintiff's account on the books of the bank is of no legal significance.

Relating to the transaction of June 16, Hoffman testified as follows:

"Well, I was down there on other matters, and when I had finished, why, I asked him if he had given me this credit, and he didn't seem to be sure, and I asked him to enter it on the book, and while he was entering it on the book he made out a ticket for it, so that was my discovery that he had not credited it on the 12th."

The books of the bank disclosed the amount was credited to the account of plaintiff on June 16, and the court made the following finding of fact, which was in accordance with the evidence:

"June 16, plaintiff learned that Drumm had not credited plaintiff on the books of the American State Bank with $28,000 as promised, and Hoffman again demanded such credit, which Drumm, cashier, then gave by entering the same on the pass book of the plaintiff company on that date, and by making out a deposit ticket for that amount, which was likewise credited to the account of the plaintiff on the books of the bank as of that date."

The brief for defendants contains the following:

"The defendants contend that the entry of credit on the 16th was but a clerical confirmation of the agreement and contract made between the plaintiff and the bank on the 12th. Mr. Hoffman, the plaintiff's cashier, testified to that effect, as follows:

" 'Q. So you took it over on the 16th, and you asked him to make the entry in your pass book, didn't you? A. Yes.

" 'Q. That is, to carry out the agreement that he had with you on the 12th, wasn't it? To carry out that agreement, and in order to carry out the agreement made, was it, also, that the entry was made on the bank's books? A. Yes.

" 'Q. To carry out the agreement that you made on the 12th? He did write this deposit? This is his handwriting there? A. Yes.' "

Now just what occurred by which a "contract" was created, and what were the terms of the so-called contract? Hoffman testified as follows:

"A. I asked him why he had let our bonds get away from him—why they were in St. Louis—and he gave me his story . . .

"Q. And did you say anything further? A. Yes, sir.

"Q. What did you say? A. Asked him to give me credit for the $28,000.

"Q. What did he say? A. He agreed."

The result is, the full extent of the only agreement which existed concerning credit for the bond loss was that Drumm would give plaintiff credit on the books of the bank for $28,000. As the court

found, Hoffman did nothing pursuant to the agreement, Drumm did nothing, and the bank did nothing. No rights or liabilities had been changed, and the entry of credit on June 16 merely fulfilled Drumm's promise to make the entry.

Defendants say acceptance of the "deposit credit" of $28,000 wiped out the debt arising from misappropriation of the bonds. There was no deposit credit. There was simply a credit. A general deposit of money, or of something representative of money or equivalent to money, passes title to the deposit from the depositor to the bank. Plaintiff did not deposit anything, and parted with no title to anything. The bank received nothing, and acquired no title to any deposit. On June 16 the bank was indebted to plaintiff in two ways: first, to plaintiff as a depositor, and second, to plaintiff on a claim for $28,000 for misappropriation of bonds. What occurred was that the debtor obligation of the bank on plaintiff's checking account was increased by the amount of the credit, and plaintiff acquired privilege to check on its account to the extent of $28,000 more than the state of plaintiff's account as a depositor would otherwise permit.

What did entry of the credit on June 16 do toward extinguishing the bank's liability for conversion of the bonds? The liability of the bank could be extinguished in one of two ways: First, by the bank giving plaintiff $28,000 in money, which was not done; second, by an agreement between plaintiff and the bank that plaintiff would accept credit on the bank's books for $28,000, instead of $28,000 in money, by way of satisfaction of the bank's liability, and entry of the credit. There was no such agreement.

The obligation of the bank to make good plaintiff's loss resulting from conversion of the bonds was an obligation to pay plaintiff $28,000; that is, an obligation to pay money. Except in a few jurisdictions, the rule is there is a rebuttable presumption that acceptance of something other than money does not constitute payment. The burden rests on the one asserting payment to show payment in fact, and in the absence of evidence the presumption is the original debt is not extinguished. The rule in this state was formulated by Justice Valentine in the opinion in the case of *Shepard v. Allen*, 16 Kan. 182 (1876):

"The weight of authority, however, would seem to be that the original debt in such a case would, *prima facie*, continue to exist; that the burden of proof to show that it had been paid or extinguished by the execution of

promissory notes therefor would rest upon the debtor; and that if no evidence were introduced except that of the mere execution of the notes it would be presumed that the original debt still continued in force, unpaid and unextinguished." (p. 184.)

This rule has been approved and applied many times, as any one interested may discover in a short time by using Shepard's Kansas Citations to trace the cases.

A transaction may embrace facts which manifest mutual assent that something other than money was accepted as performance of an obligation to pay money. The case of *Shepard v. Allen* is illustrative. So is the case of *Burdett v. Surdez,* 94 Kan. 494, 146 Pac. 1025. The inference from the facts, however, is one of fact, to be drawn by the jury, or by the court when the issue is tried by the court. (*Insurance Co. v. Benner,* 78 Kan. 511, 97 Pac. 438.)

In this instance the facts are simple, undisputed, and to this effect: Hoffman said to Drumm, "Plaintiff wants credit for $28,000, the face value of the bonds you misappropriated." Drumm said, "I will enter the credit." The credit was entered on plaintiff's pass book, and on its checking account on the books of the bank. The result was that an executory obligation of the bank to pay plaintiff's check or checks to the amount of $28,000, when presented, was created. The principle governing such a set of facts was stated by Chief Justice Kingman in the opinion in the case of *Kermeyer v. Newby,* 14 Kan. 164 (1875). The case was a check case. The syllabus reads:

"The mere taking of a bank check for a debt is not a payment of the debt until cashed, nor is it an extinguishment of the contract for which it was given."

In the opinion it was said:

"The giving of one simple executory contract for another does not extinguish the latter." (p. 167.)

The decision in *Kermeyer v. Newby* has been approved many times. It was followed in the case of *Mordis v. Kennedy,* 23 Kan. 408, 409, which was followed in the late case of *Baker-Evans Grain Co. v. Ricord,* 126 Kan. 107, 111 (1928), 267 Pac. 14.

Defendants cite the case of *Watkins v. Parsons,* 13 Kan. 426. In that case A owed B. A drew a check on a bank in B's favor for the amount of the debt. B received the check, presented it to the bank, and took credit for the amount of the check on his own account with the bank. When the check was presented, A had funds

in the bank in an amount in excess of the amount of the check. Afterwards the bank failed. The syllabus reads:

"Where a party both receives and uses a check, the presumption is that he realizes the full amount thereof, and if thereafter he seeks to recover that amount from the drawer, it is incumbent on him to show that he did in fact fail to realize." (Syl. ¶ 1.)

In the opinion the court said that by accepting and using the check B elected to take the bank as his debtor instead of A. In this case plaintiff did not elect to accept a third person as its debtor. The bank was debtor all the time, and whether plaintiff realized on the book credit is a matter to be presently considered.

The form of the opinion in *Watkins v. Parsons* was controlled by the fact there was a contention the check was fraudulently issued. Leaving fraud, bargain, or other modifying circumstances at one side, acceptance of a check for the amount of a debt does not pay the debt. If, however, the creditor presents the check for payment, the debtor has funds to meet the check, the bank pays the check and charges the amount to the account of the drawer, and the payee, instead of taking money, takes credit on his own account at the bank, the transaction does effect payment of the debt. The principle involved was applied in the case of *First Church of Christ, Scientist, v. Ætna Bldg. and Loan Ass'n,* 122 Kan. 672, 253 Pac. 574, cited by defendants, and in the case of *Davison v. Maryland Casualty Co.,* 126 Kan. 365, 267 Pac. 1001, and is manifestly sound.

The legal relations of three persons are involved: A, the debtor, B, the creditor, and the bank on which the check is drawn. The bank is a debtor of A, obligated to pay A's checks on presentation, if A is in funds. The check is presented, A has funds to meet it, the bank accepts the check, and charges the amount to A's account. The check is paid, becomes a dead instrument, and the obligation of the bank to pay *pro tanto* its debt to A is discharged. B could demand and get money. He does not do so, but takes credit on his own account. His privilege to demand money for the check is exhausted. He is willing to take the bank's obligation to pay money, for the money itself. He elects to accept the bank as his debtor, and his election fixes the legal relations of the parties. We have no such case here.

In the opinion in the case of *Bouton v. Hill,* 38 N. Y. Supp. 498, cited by defendants, appears the following:

"A transfer of credit by consent of parties is equivalent to payment. (*Bank v. Burkhart,* 100 U. S. 686-689)." (p. 501.)

The question in *Bouton v. Hill* was, What would amount to a payment to toll the statute of limitation? The syllabus reads:

"In an action on a note, it appeared that it was made in 1883, with the understanding that, if the amount named in it exceeded the true indebtedness of the maker, it should be made right; that in 1890 it was found that the amount was too large, and the difference was, by direction of defendant [maker], indorsed as a payment as of the date of the note. *Held,* that such indorsement was, in effect, a payment at the time it was made, and removed the note from the bar of limitations." (p. 498.)

In the opinion the court discussed the subject of what would indicate acknowledgment of liability, cited the cases showing that giving of collateral security has that effect, and said:

"It will be seen, from the cases cited, that the reason that payment is held to remove the bar of the statute is that it is an act acknowledging liability for the whole demand, and the law implies a promise to pay what is left of it, the promise so implied dating from the time of the part payment. . . . The indorsement was not made by the plaintiff, but by a third party, with the consent, or, it may rather be said, by the instruction, of the defendant. And it was done under such circumstances as to show an acknowledgment of the balance of the note, and an intention to pay it. Her claim that she would be deprived of the benefit of the interest upon it, if it was indorsed as of that date, emphasizes her acknowledgment of the balance of the note, and of her intention to pay. The whole transaction brings it clearly within the reason of the decisions I have cited, for allowing payment to prevent the operation of the statute; . . ." (pp. 501, 503.)

In the case of *National Bank v. Burkhardt,* 100 U. S. 686, cited in the New York case, the question was whether, when the holder presented a check to the bank on which it was drawn, what was done amounted then and there to payment of the check and deposit by the holder, or whether the arrangement was that the check should be held until the end of the business day, to see what the state of the drawer's account might then be. The jury found the check was offered and received as a deposit. The finding determined a question of liability on the guaranty given later in the day to secure advances by the bank to the drawer of the check thereafter to be made. In the opinion the court said:

"When a check on itself is offered to a bank as a deposit, the bank has the option to accept or reject it, or to receive it upon such conditions as may be agreed upon. If it be rejected there is no room for any doubt or question between the parties. If, on the other hand, the check is offered as a deposit

and received as a deposit, there being no fraud and the check genuine, the parties are no less bound and concluded than in the former case." (p. 689.)

The result is, the New York decision, and the case cited as authority for the decision, have no bearing on the present controversy. It is not necessary to extend this opinion by further consideration of particular decisions. In this instance the bank paid nothing by entering the credit, and remained liable to plaintiff for the loss plaintiff had sustained the same as before.

Defendants contend that after the entry of credit the bank paid the amount of the loss plaintiff had sustained on account of misappropriation of the bonds. Whether this is so depends on the law of this state relating to application of payments.

When the bank opened on June 16 plaintiff had a credit balance of $32,472.24. At the close of business on June 16 the balance was $60,882.83, which included the credit of $28,000. At the close of business on June 18 the credit balance was $75,607.66. On both days there were deposits and withdrawals in the usual course of business. Defendants say the rule of application of payments, "first in, first out," governs. If it does the $28,000 credit was exhausted before the bank failed. Plaintiff insists the rule of application of payments to unsecured items first applies. If it does the judgment of the district court was correct.

Defendants did not insure bank deposits. They did insure against loss resulting from misappropriation of the bonds. As shown above, the entry of credit on the bank's books on June 16 was not an entry of a deposit. For all purposes of the law the situation was precisely the same as if there were a notation opposite the entry, "Unpaid loss occasioned by misappropriation of bonds." That loss was secured by defendants' policy, and the burden rested on defendants to show plaintiff was reimbursed by the bank.

There was no evidence that either plaintiff or the bank made application of any money withdrawn from the bank and charged to plaintiff, to discharge the bank's liability for plaintiff's loss. Under those circumstances the law in this state is, and for more than fifty years has been, that withdrawal of funds by plaintiff from the bank should be applied to unsecured deposits. (*Shellabarger v. Binns,* 18 Kan. 345; *State v. Guaranty Co.,* 81 Kan. 660, 106 Pac. 1040; *Barber County Comm'rs v. Lake State Bank,* 121 Kan. 223, 246 Pac. 524—afterwards disposed of on other grounds.)

The principle involved is that it is equitable the bank's whole debt should be paid, and it cannot be inequitable to extinguish first those debts for which the security was most precarious. (*Field v. Holland*, 6 Cranch, 8.) Defendants, being sureties for hire, are not in position to complain of the effect on them of application of the rule. (*Medical Co. v. Hamm*, 89 Kan. 138, 145, 130 Pac. 650.)

In the case of *State v. Guaranty Co.*, 81 Kan. 660, 106 Pac. 1040, the action was one by the state to recover on a bond given by a bank as a depositary of state funds, and signed by the guaranty company as surety. A judgment for the state was affirmed. Defendants distinguish the case on the ground the bond was given by the bank, while in this case the creditor procured the security. The distinction is without force. How payments should be applied depends on whether there is security, and not on who paid for the bond or policy of indemnity. In mechanic's lien cases a creditor procures his own security by complying with the lien law. The rule is to apply payments made by the debtor to satisfy nonlienable items first. *Shellabarger v. Binns*, 18 Kan. 345, was such a case, and the rule prevails in those states which have adopted the common-law rule relating to application of payments.

Defendants' answer pleaded settlement and compromise by plaintiff of its claim against the bank. The argument in support of the defense is fully answered by what has already been said.

The judgment of the district court is affirmed.